IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL J. PISKANIN,<br><br>          Plaintiff,<br><br>v.<br><br>EDWARD RENDELL *Individually, and as the Governor of the Commonwealth of Pennsylvania and as a Freemason*; JEFFREY BEARD, *Individually, and as the Secretary of the Commonwealth of Pennsylvania, Department of Corrections*; COMMONWEALTH OF PENNSYLVANIA; DEPARTMENT OF CORRECTIONS  SUPERINTENDENT GOOD, *Individually, and as Superintendent, SCI Cresson and an employee of Pennsylvania Department of Corrrections*; and MRS. RIEFER, *Individually, and as an employee of the Pennsylvania Department of Corrections at SCI Cresson,*<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>Civil Action No. 06 - 129J<br><br>Judge Kim R. Gibson / Magistrate Judge Lisa Pupo Lenihan<br><br><br>Doc. No. 69 |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

I.      **RECOMMENDATION**

        For the reasons that follow, it is respectfully recommended that Defendants' Motion for Summary Judgment (doc. no. 69) be granted.

II.      **REPORT**

        Plaintiff, Michael J. Piskanin, an inmate incarcerated at the State Correctional Institution at Cresson, Pennsylvania, commenced this action claiming that Defendants violated his constitutional and federal rights by denying him his "Miraculous

Medal" and by requiring him to throw away a "blessed cloth scapular," which was given to him while he was incarcerated at SCI Camp Hill. Remaining Defendants include: Jeffrey Beard, Secretary of the Pennsylvania Department of Corrections; the Pennsylvania Department of Corrections; Superintendent Good, Superintendent of SCI Cresson; and Ms. Riefer, employee at SCI Cresson.

## A. Standard of Review

Defendants have filed a motion for summary judgment pursuant to Fed. R. Civ. Proc. 56 (doc. no. 52). Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, ". . . the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth ". . . specific facts showing that there is a  genuine issue for trial . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). An issue is

genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). The inquiry, then, involves determining "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Brown v. Grabowski</u>, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218 (1991) (<u>quoting</u> <u>Anderson</u>, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. Proc. 56 (e); <u>Celotex Corp.</u>, 477 U.S. at 324; <u>J.F. Feeser,Inc., v. Serv-A-Portion, Inc.</u>, 909 F.2d 1524, 1542 (3d Cir. 1990).

### B. Material Undisputed Facts

On July 12, 2005, Piskanin was committed to SCI Graterford pursuant to a judgment of sentenced imposed by the Court of Common Pleas of Lehigh County. At that time, SCI-Graterford required him to surrender his Miraculous Medal for mailing home (doc. no. 69-2, p. 15). Plaintiff was transferred to SCI-Camp Hill where his family mailed the medal to him. The mailroom at SCI-Camp Hill confiscated the medal because of its size and because it was sent to Plaintiff from home contrary to DOC policy (doc. no. 69-2,

p. 20).  Plaintiff's medal is approximately one and one-half (1½) inches in length including the bale (doc. no. 69-2, p. 29).

Plaintiff was transferred to SCI-Cresson on September 30, 2005.  On October 10, 2005, Plaintiff filed Grievance No. 132408 wherein he claimed that his medal was improperly seized at SCI-Graterford and SCI-Camp Hill and that his cloth scapular was improperly discarded just prior to his transport to SCI-Cresson (doc. no. 69-2, p. 15).  This Grievance was rejected by the SCI-Camp Hill grievance coordinator who advised Plaintiff to present his grievances separately to each facility where the alleged conduct occurred (doc. no. 69-2, p. 14).  On or about January 9, 2006, Plaintiff wrote a letter to Secretary Beard complaining about the confiscation of his medal (doc. no. 69-2, p. 13).  SCI-Camp Hill forwarded Plaintiff's medal and the documents relating to Grievance 132408 to SCI-Cresson on or about January 18, 2006 (doc. no. 69-2, p. 12).

On January 23, 2006, Plaintiff sent a Request Slip to defendant Reifer, Superintendent's Assistant, regarding the status of his medal (doc. 69-2, p. 19).  Reifer met with Plaintiff on or about January 25, 2006.  At that time, she issued Plaintiff a confiscation slip and maintained possession of the medal pending resolution of Plaintiff's grievance (doc. no. 69-2, p. 20).  Plaintiff then filed Grievance 142272 on January 26, 2006 claiming that the measurement of the medal, not including the bale, was only one and one-quarter inches, and therefore, in accordance with DOC policy (doc. no. 69-2, p. 10).  The medal was retained by Reifer

pending resolution of the grievance process, at which point, Plaintiff was told that he would be able to mail it home or have it destroyed (doc. no. 69-2, p. 2). Plaintiff provided Ms. Reifer with a mailing address to return the medal but also requested that the medal be insured for $500.00 (doc. no. 69-2, p. 23, ¶ 5), which is above the $50.00 monetary value limit for religious medallions as set forth in DOC policy DC-ADM 815. At that time, Plaintiff had a negative balance in his prison account and was unable to pay for postage. Reifer has continued to maintain possession of the medal during the pendency of this litigation.

Plaintiff currently wears a religious cloth scapular around his neck. The scapular may be worn in general population but not in the restricted housing units (RHU). Plaintiff's scapular was removed from his person and placed in his property while he was in the RHU serving disciplinary time (doc. no. 69-2, p. 31). It was returned to him upon his release to general population. *Id*.

DOC policy DC-ADM 815 permits inmates to possess a religious medal which is no larger than 1 ¼ inches, with a chain no longer than 26 inches and a maximum value of $50, no gem stones. DC-ADM 815 VI(A) (doc. no. 69-4, p. 7). The 1-1/4 inch size limitation has been included in DOC written policy, in some format, since approximately 1994 (doc. no. 69-3, p. 8). Plaintiff was not incarcerated in the DOC from 1984 until July 2005 when he entered SCI-Graterford. If Plaintiff ever wore his medal at DOC

institutions in the past, it would have been prior to 1984 (doc. no. 69-2, p. 23).

DC-ADM 815 prohibits inmates from receiving items of personal property, including religious medallions, from family or friends.  DC-ADM 815 VI(E).  SCI-Cresson does not permit any inmate, regardless of religious faith, to possess a religious medallion that does not comply with DC-ADM 815's size and value limitations or that is sent to an inmate from home or any other outside source (doc. no. 69-2, p. 24, ¶10).  Inmates at SCI-Cresson have been required to return wedding bands that were mailed to them from a family member or spouse.  *Id.*

Sports medals, which may be larger than one and one-half inches, may only be displayed in an inmate's cell and are not permitted to be worn around the neck on a chain.  Id. at ¶ 11. Certain inmates in Housing Units A, C and F are permitted to wear cell keys that are larger than one and one-half inches because the rooms in those units have standard doors which lock by key. SCI-Cresson permits these inmates to wear the keys around their necks on a string to prevent losing them and to allow the inmates to lock and unlock their cells.  If an inmate with a key in Units A, C and F would attempt to alter or modify his cell key, the key to the cell would not work.

Religious medals are available from DOC's approved vendors and are included in the approved outside purchase list (doc. no. 69-3, pp. 12-13).  The DOC maintains an "Approved Religious Vendors and Articles List" which identifies the religious

items which inmates may order, as well as the vendors approved to sell those items. (doc. no. 69-3, pp. 20-21). Inmates are permitted to possess only one religious medallion. DC-ADM 819 VI (C)(2). The Approved Religious Vendors and Articles List specifically provides that an inmate who wishes to purchase a medal not on the approved list to submit an Accommodation Request Form (DC-52) to their Facility Chaplaincy Program Director for processing (doc. no. 69-3, p. 12; 69-4, p. 49). DC-ADM 819 VI (G) also sets forth the procedure for requesting a religious accommodation, which is reviewed by the Religious Accommodation Committee. Plaintiff never has submitted any Accommodation Request with respect to any religious item or medal.

The Miraculous Medal, aka the Medal of the Immaculate Conception, is a medal created by Saint Catherine Labouré in response to a request from the Blessed Virgin Mary who allegedly appeared to her in 1830.[1] The message on the medal reads: "O Mary, conceived without sin, pray for us who have recourse to you — 1830." Many Catholics around the world wear the Miraculous Medal, which they believe will bring them special graces through the intercession of Mary if worn with faith and devotion; it is often worn together with the Brown Scapular. Any Miraculous Medal, regardless of size, serves this function. Possession of a Miraculous Medal is not mandated by the Catholic Church and its use is not an activity fundamental to the faith (doc. no. 69-3, p. 2,

---

1. Catholic Encyclopedia (1913).

¶3). Plaintiff attaches great sentimental value to his Miraculous Medal as it was a gift from his late wife.

A cloth scapular also is a sign of Mary's protection and of voluntarily doing the will of God.[2] It consists of two pieces of brown wool cloth with one segment hanging on the wearer's chest and the other hanging on his/her back. It stands for a commitment to follow Jesus, like Mary, the perfect model of all the disciples of Christ. Catholics believe that wearing the scapular, and leading a life of devotion, ensures that Mary will provide them protection from hell in the hour of death. Devout Catholics believe that Mary's intercession grants last rites to the wearer and ensures eternal salvation from hell. However, "[t]he Scapular is not a magical charm to protect you or an automatic guarantee of salvation."[3]

The Roman Catholic Church considers scapulars and miraculous medals as "sacramental." Sacramentals are material objects or things set apart or blessed by the Catholic Church to manifest the respect due to the Sacraments and to promote good thoughts and to increase devotion, and through these to remit venial sin.[4]

Roman Catholic inmates at SCI-Cresson have the opportunity to attend mass and confession once a week (doc. no. 69-

---

2. The Brown Scapular of Our Lady of Mount Carmel: A Sign of Christian Faith & Commitment. *See* http://www.carmelite-seremban.org/Spirituality/scapular.html.

3. *Id.*

4. Council of Trent (Session XXII, 15).

3, p. 3).   There is no full-time Catholic Chaplain but Father Gulash is available to visit inmates in the event of emergency throughout the week is able to meet with individual inmates and provide for their spiritual needs at other times, in accordance with his schedule.  *Id.*

## C. Liability under 42 U.S.C. § 1983

Plaintiff's Complaint seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983.  To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

Plaintiff claims that the denial of his miraculous medal denied him the opportunity to practice his Catholic religion in violation of the First Amendment, which provides as follows.

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend. I.

The First Amendment guarantees that all prisoners must be afforded reasonable opportunities to exercise their religious freedom. Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972). In order to state a violation of the right to exercise one's religion, a plaintiff must allege a "substantial burden" on the exercise. *See, e.g.*, Thomas v. Review Bd., 450 U.S. 707, 718 (1981); Wisconsin v. Yoder, 406 U.S. 205, 218 (1972). However, with respect to prisoners, the inquiry does not end there.

Although inmates retain certain protections afforded by the First Amendment, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (quotations omitted). In Shabazz, the Supreme Court determined that prison regulations alleged to infringe upon an inmate's "religious" rights under the First Amendment must be reviewed under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Id*. In so concluding, the Court held that when a prison regulation impinges on inmates' constitutional rights "the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. at 349. In determining whether the regulation was "reasonably related," the Court employed the four-factor test that it developed in Turner v. Safley, 482 U.S. 78, 89

(1987), namely:  1) whether there is a rational connection between the regulation and the penological interest asserted; 2) whether inmates have an alternative means of exercising their rights; 3) what impact accommodation of the right will have on guards, other inmates and the allocation of prison resources, and 4) whether alternative methods for accommodation exist at *de minimis* cost to the penological interest asserted.

The issue in <u>Shabazz</u> concerned Muslim prisoners who were assigned to minimum security work outside prison walls, which prevented them from attending Islamic Jumu'ah services that were held each Friday.  The prisoners argued that the service was essential to their religion and was one in which all Muslims were required to participate.  The prison did not contest the sincerity of the prisoners' beliefs but contended that it lacked sufficient staff to escort the prisoners to the services and that the services might cause other disruptions in the prison.  In reviewing the prisoners' claim, the Supreme Court applied the four <u>Turner</u> factors as follows.

Under the first factor, a regulation must have a logical connection to legitimate governmental interests invoked to justify it.  In <u>Shabazz</u>, the Court held that the requirement that the prisoners work outside the main facility was justified by concerns of institutional order and security and was, in part, a response to critical overcrowding in the state's prisons.  <u>Shabazz</u>, 482 U.S. at 350-351.  In addition, the Court determined that the policy prohibiting returns to the institution during the day also was

reasonably related to a legitimate government interest because returns from the outside work details generated congestion and delays at the main gate, a high risk area in the institution, and inhibited the rehabilitative aspect of the work program. *Id*., at 351.

The second factor considered in Shabazz was whether there were alternative means for Muslim prisoners to participate in other Muslim religious ceremonies. In undertaking this inquiry, the Supreme Court specifically noted that, although there were no alternative means for Muslim prisoners to attend the Jumu'ah services, they were still able to participate in other Muslim ceremonies, including special meals and the month-long observance of Ramadan. In addition, they were able to attend prayer and discussion groups at almost anytime during non-working hours. In light of this evidence, the Court concluded that the prisoners' ability to participate in other religious observances supported the conclusion that the restrictions at issue were reasonable. Shabazz, 482 U.S. at 352.

The third factor considered in Shabazz was whether there were practical options available that would allow the prisoners to practice their faith without causing unreasonable difficulties for the prison or an unreasonable burden on prison resources. In Shabazz, the Muslim inmates suggested several accommodations that would allow them to attend the Jumu'ah services, including placing all Muslim inmates in one or two inside work details or providing weekend labor for Muslim inmates. In response to these

suggestions, prison officials stated that inside work details were inconsistent with applicable regulations, which required outside work detail for minimum security prisoners. *Id*. at 352. In addition, the extra supervision necessary to establish weekend details for Muslim prisoners would be a drain on scarce human resources at the prison. *Id*. at 353. Also, prison officials determined that the alternatives would threaten prison security by allowing affinity groups in the prison to flourish. Finally, the officials determined that special arrangements for one group would create problems as other inmates would see that a certain segment was escaping a rigorous work detail and perceive favoritism. *Id*. The Court found that these concerns provided adequate support for the conclusion that accommodation to attend Jumu'ah services would have undesirable results in the institution. *Id*.

The final <u>Turner</u> factor applied in <u>Shabazz</u> was a determination of whether there were obvious easy alternatives to the policy adopted by prison officials. As noted in <u>Turner</u>, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." <u>Turner</u>, 482 U.S. at 90. In <u>Shabazz</u>, the Court concluded that there were no obvious, easy alternatives to the regulations at issue in the case because prison officials had determined that the suggested accommodations would have adverse effects on the institution. <u>Shabazz</u>, 482 U.S. at 353.

In the instant action, Plaintiff has failed to show how his inability to possess his miraculous medal substantially

impacted his ability to exercise a central tenet of his religion. While he may want to have his medal, he has not provided any evidence that it a required central tenet of the Catholic religion. Rather, the evidence merely shows that it is an aid used by Catholics to remind them to lead a virtuous life. Thus, Plaintiff has failed to show how Defendant's actions violated his religious freedom rights as protected by the First Amendment.

Moreover, employing the <u>Turner</u> analysis to the facts at bar, it is clear that Plaintiff is not entitled to relief with respect to his claim. Under the first <u>Turner</u> factor, Defendants have adequately demonstrated that the 1½ inch size limitation for religious medals is reasonably related to the prison's legitimate penological interests in promoting institutional security. Personal property in the form of jewelry is not permitted in DOC facilities subject to a limited number of exceptions spelled out in DC-ADM 815: watches (valued limited to $50), a wedding band ring without gemstones, one pair of earrings, and religious medallions subject to size, composition and value limitations (doc. no. 69-3, p. 6, ¶5). Steve Gunt, Major of Security for the Pennsylvania Department of Corrections submitted a declaration that jewelry items, including religious medals, which may be on the inmate's person at all times, can be used as or fashioned into a weapon, or stolen or smuggled within the facility due to perceived value and/or uniqueness (doc. no. 69-3, p. 6). He further declared that, in a prison setting, relatively innocuous items of personal property often are altered for use as a weapon or for use as a tool

to access or damage security fixtures. (doc. no. 69-3, p. 8; doc. nos. 70-2, 70-3 and 70-4). In response to numerous incidents of homemade weapon assaults and/or seizure of contraband, the DOC has continued to review and modify its policies regulating the possession of personal property and has developed statewide standards with respect to access, size and value (doc. no. 69-3, p. 7). With the need for increased control and security in its facilities, the DOC has modified the size of relatively innocuous (but necessary) items such as toothbrushes and razors to limit their misuse as a weapon or tool. DOC's regulation of size, composition, value and origin/access of religious medals serves the compelling legitimate interest of promoting institutional safety and security (doc. no. 69-3, p. 6). *Cf.* <u>Lemay v. Dubois</u>, 1996 WL 463680, 3-4 (D. Mass. 1996) (citing to a Massachusetts regulation limiting the size of religious medals to a diameter of 1 ½ inches).

Under the second <u>Turner</u> factor, the court must determine whether alternative means exist for Plaintiff to exercise his Catholic religion. The record reflects that Plaintiff has the opportunity to attend mass and confession each week. Plus, Father Goulash is available to individually meet with Plaintiff. Moreover, Plaintiff may obtain a Catholic four-way medal in accordance with DOC policy. This medal contains images of the Sacred Heart, St. Joseph, St. Christopher and the Miraculous Medal. Plaintiff complains that access to the four-way medal is insufficient to fulfill his needs because it contains St. Christopher, a saint no longer recognized by the Catholic Church.

15

His argument is unpersuasive for several reasons. First, with respect to St. Christopher:

> Before the 1969 reform of the Roman calendar, Christopher was listed as a martyr who died under Decius. Nothing else is known about him. There are several legends about him including the one in which he was crossing a river when a child asked to be carried across. When Christopher put the child on his shoulders he found the child was unbelievably heavy. The child, according to the legend, was Christ carrying the weight of the whole world. This was what made Christopher patron saint of travelers. His former feast day is July 25.
>
> Before the formal canonization process began in the fifteenth century, many saints were proclaimed by popular approval. This was a much faster process but unfortunately many of the saints so named were based on legends, pagan mythology, or even other religions -- for example, the story of the Buddha traveled west to Europe and he was "converted" into a Catholic saint! In 1969, the Church took a long look at all the saints on its calendar to see if there was historical evidence that that saint existed and lived a life of holiness. In taking that long look, the Church discovered that there was little proof that many "saints", including some very popular ones, ever lived. Christopher was one of the names that was determined to have a basis mostly in legend. Therefore Christopher (and others) were dropped from the universal calendar.
>
> Some saints were considered so legendary that their cult was completely repressed (including St. Ursula). Christopher's cult was not suppressed but it is confined to local calendars (those for a diocese, country, or so forth).

Catholic Online: Saints and Angels.[5] Consequently, Plaintiff's assertion that St. Christopher no longer is recognized by the

_____

5.  *See* http://www.catholic.org/saints/faq.php#St.%20Christopher.

Catholic Church is not accurate. While his feast day no longer is listed on the Calendar, local diocese may choose to honor St. Christopher.

Second, the fact that St. Christopher may also be on the medal should not diminish the importance of the miraculous medal, *i.e.*, the belief that Mary will grace the wearer. Plaintiff has not submitted any evidence that Catholic belief so holds. Third, the medal, by itself, is meaningless; it is the symbol of the faith and serves to promote a spiritual and good life. Any miraculous medal will fulfill this purpose. Plaintiff places sentimental value upon his medal but the fact that it was given to him by his wife has nothing to do with its religious value.

Moreover, Plaintiff is able to wear his blessed cloth scapular in general population. The scapular serves his religious interest in promoting the service of the blessed Mary and receiving her benefit of everlasting peace. Moreover, it serves to identify Plaintiff as a Catholic should he require the services of a priest.

Plaintiff complains that he is in danger of being damned to eternal hell if he does not wear his miraculous medal. However, as noted in all of the Catholic information resources, it is not the medal or scapular that provide the grace of Mary; rather, it is the belief and actions of the wearer that earn Mary's favor. Plaintiff is not assured a berth in heaven merely for wearing the medal or scapular. Catholic doctrine holds that God will judge him in the end. Thus, the fact that he may not possess his medal has no impact on his ability to enter the pearly gates. Moreover, the

scapular identifies him as a catholic. In addition, he may purchase a rosary or crucifix. The record is clear that Plaintiff is provided with many alternative means for exercising his religious needs. Thus, this factor weighs in favor of the regulation.

The third factor considered in <u>Shabazz</u> was whether there were practical options available that would allow the prisoner to practice their faith without causing unreasonable difficulties for the prison or an unreasonable burden on prison resources. In this regard, the court may consider "an appearance of favoritism that could generate resentment and unrest." <u>Standing Deer v. Carlson</u>, 831 F.2d 1525, 1529 (9th Cir. 1987) (citation omitted). Allowing Plaintiff to possess his miraculous medal could have an unfavorable "ripple effect" that could generate resentment and unrest. Moreover, its uniqueness would invite theft and violence. These security concerns weigh in favor of upholding the regulation.

The final <u>Turner</u> factor is whether there are obvious easy alternatives to the policy adopted by prison officials. Here, the policy allows an inmate to seek an accommodation. Plaintiff has not submitted any accommodation request. Moreover, legitimate security concerns show that there are no obvious, easy alternatives to the regulation at issue because the suggested accommodation would have adverse effects on the institution. The fact that sports medals may be larger does not prove there are easy alternatives. Sports medals are not allowed to be worn around the neck. Nor does the fact that some prisoners are allowed to wear

keys around their neck show that there are easy alternatives. Those keys are necessary to open the cells in certain older areas of the prison. The fact that the keys may be larger than 1½ inches does not diminish the security concern that led to the 1½ inch size limitation for religious medals. It is simply a fact that such keys are required to open the cells in the older section of the prison. Whenever that section is updated, it is assumed the keys no longer will be required. It simply does not show that there are easy alternatives to the DOC regulation. Accordingly, Plaintiff has failed to state a claim for violation of his First Amendment right to free exercise.

### D. RLUIPA

Plaintiff also brings his claim under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* (RLUIPA). Section 3 of RLUIPA states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that ... interest." 42 U.S.C. § 2000cc-1(a). The plaintiff has the burden of persuasion on whether the challenged practice or law substantially burdens the plaintiff's exercise of religion. 42 U.S.C. § 2000cc-2(b).

The Court of Appeals for the Third Circuit has determined that, "[f]or the purposes of RLUIPA, a substantial burden exists

where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007). Clearly, Plaintiff cannot meet this test. First, he is not forced to chose anything. He has access to a miraculous medal via the four-way medal, he has access to his blessed cloth scapular, he has access to mass and confession, he has access to individual spiritual guidance from Father Goulash, and he is not forfeiting any benefits. Second, in no way does the regulation put any pressure on Plaintiff to modify his behavior and violate his beliefs. The medal and scapular are sacramentals used in aid of prayer and reminding one to lead a holy life. Plaintiff in no way is denied his ability to pray and follow the virtue of Mary. He is in no more danger of going to hell with or without the medal or scapular. Further, he easily is identified as a Catholic by his scapular and his ability to wear the four-way medal, a rosary or a crucifix should he be in need of last rights. Finally, true to his alleged belief, he would not need last rights if he is wearing the scapular because Mary's benefit to the wearer who lives a good life is to guide him or her into everlasting peace in heaven. Plaintiff need only remain free of disciplinary action to be able to wear his scapular in general population.

The record shows that Plaintiff has not met his burden of showing that the DOC 1½ inch restriction substantially burdens his ability to practice his Catholic faith. Thus, his claim fails under RLUIPA. *Accord* <u>Sharp v. Johnson</u>, 2008 WL 941686, \*22 (W.D.Pa. Apr. 7, 2008); <u>Smith v. Kyler</u>, 2008 WL 474252, \*4 (M.D.Pa. Feb. 20, 2008).

### E. Alleged Destruction of Cloth Scapular

Plaintiff alleges that he obtained a blessed cloth scapular from a visiting priest while at SCI-Camp Hill but was forced to throw it away against his will when he was transferred to SCI-Cresson. None of these allegations assert liability against any of the named Defendants in this action as they do not allege personal involvement against any named Defendant. Thus, Defendants' Motion for Summary Judgment should be granted as to this claim.

### III.  <u>CONCLUSION</u>

It is respectfully recommended that the Defendants' Motion for Summary Judgment (doc. no. 69) be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

_____
Lisa Pupo Lenihan
U.S. Magistrate Judge

Dated       September 10, 2008

cc:         The Honorable Kim R. Gibson
            United States District Judge

            Michael Piskanin
            GG - 2457
            SCI Cresson
            PO Box A
            Cresson, PA 16699-0001